No. 45,222

CLARA SILKS, *Appellee,* v. LATERAL SEWER DISTRICT No. T-39, Within SHAWNEE and MISSION TOWNSHIPS TURKEY CREEK MAIN SEWER DISTRICT No. 1, JOHNSON COUNTY, KANSAS, and KENNETH HEARD, HERMAN F. HIGGINS and CARL STANDIFORD, As The GOVERNING BODY of Said District and COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, *Appellants.*

(450 P. 2d 25)

Opinion filed January 25, 1969.

*James H. Bradley,* of Olathe, argued the cause, and was on the briefs for the appellants.

*Louis A. Silks, Jr.,* of Shawnee Mission, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

KAUL, J.: This is an action for injunctive relief and to set aside special lateral sewer assessments levied pursuant to K. S. A. 19-2793 (Laws of 1965, Chapter 170, Section 2) Portions immaterial to this action have since been amended and the statute now appears as K. S. A. 1968 Supp. 19-2793. For convenience the statute will hereafter be referred to as K. S. A. 19-2793 or 19-2793.

The appellant-defendant Board of County Commissioners of Johnson County, as the Governing Body of defendant Lateral Sewer District No. T-39 (hereafter referred to as the governing body or defendants), have appealed from an adverse judgment.

The assessments attacked here were spread under the same statute by the same Lateral Sewer District as in *Hessell v. Lateral Sewer*

*District,* 202 Kan. 499, 449 P. 2d 496, this day decided. Much of what was said and held in the *Hessell* case is applicable herein and will be pointed out in the course of this opinion.

Plaintiff-appellee is the owner of land described as Lot A and Lot B, Corbin Place Resurvey, a subdivision in the City of Merriam, Johnson County. The special assessment levied by the governing body against Lots A and B were $2,032.74 and $3,710.08, respectively. On October 18, 1966, a public hearing on the apportionment of costs and assessments was held pursuant to K. S. A. 19-27,105. Plaintiff appeared and objected to the assessments against her two lots. The governing body rejected plaintiff's objections and by resolution confirmed the assessments. Thereafter, plaintiff filed this action in district court.

Plaintiff alleged in her petition that the assessments against her lots were computed on the basis of the total number of square feet, contrary to the provisions of 19-2793, and that such action by the governing body was arbitrary, capricious and without legal authority. She prayed that such assessments be declared null and void; that the defendants be enjoined from spreading the assessments on the tax rolls; and that the court determine what assessments should be levied. In their answer defendants specifically denied that the assessments were levied contrary to 19-2793 or that their action was capricious and without legal authority. They admitted other allegations of plaintiff.

Trial was had to the court and on December 30, 1966, findings of fact and conclusions of law were made and judgment entered declaring the assessments null and void and the action of the governing body unreasonable, arbitrary and contrary to 19-2793. The trial court enjoined defendants from spreading the special assessments on the tax rolls and then determined how the special assessments should be spread against plaintiff's two lots.

After their motion for a new trial was overruled defendants perfected this appeal. Basically, as in the *Hessell* case, the controversy involves the construction and application of the provisions of K. S. A. 19-2793. Pertinent provisions of the statute read:

"The cost of any such lateral sewers whenever built, including engineering and legal services, shall be spread equally per square foot over all land to *a depth of one hundred fifty (150) feet measured from the front property line or to the rear property line if less than one hundred fifty (150) feet* within such lateral sewer district and all such areas are to be computed on the basis of the

net area exclusive of streets or roads, cemeteries or public parks; *that for the purpose of this provision the term 'front property line' shall be considered to be (a) the front line of the lots established by recorded plats; or (b) in the case of unplatted lands, the front line established by recorded private restrictions; or (c) in case of lands not so platted or restricted, as determined by the governing body . . . Provided, That in the event any land within the lateral sewer district which shall have been exempted from assessment as being in excess of a depth of one hundred fifty (150) feet measured from the front property line, as herein provided, shall thereafter be served by said lateral sewer, said lands shall be subject to assessment and levy the same as are being levied upon all other lands in such lateral district and shall also provide for additional levies upon said land to pay a proportionate share of all amounts previously paid by such district upon any outstanding bonds: . . ."* (Emphasis supplied.)

The portion emphasized provided for a substantially different method of assessment from that of the previous governing statute which provided that the cost of lateral sewers "shall be spread equally per square foot over all land within such lateral sewer district." (Laws of 1953, Chapter 162, Section 7, G. S. 1953 Supp. 19-2793.)

The practical effect of the 1959 revision was to change the assessment of costs from an unlimited square foot basis to an assessment limited to square feet of land to a depth of 150 feet measured from the "front property line" or if the property in question was less than 150 feet in depth then to the rear property line. There was evidence that the legislative purpose of the 1959 revision was to cure and alleviate the inequities of a total square foot assessment on tracts exceptionally deep or large and in irregular or unusual shapes.

Plaintiff's lots are contiguous and adjacent to one another. Lot A is a corner or end lot, located to the west of Lot B. Lot A contains 24,943 square feet and Lot B contains 45,525 square feet. The south boundary of Lot B is 140 feet long and abuts Hocker Drive, a public street. The north boundary is 200 feet long and abuts 57th Street. The average depth of Lot B is about 260.5 feet. The east boundary thereof is 261 feet and the west boundary (which is common with the east boundary of Lot A) is 260 feet. Lot A is bounded on the south, west and north by an irregular semicircular boundary which abuts Perry Lane. As noted, the depth (north and south) of Lot A is 260 feet at its east boundary, which is common with the west boundary of Lot B. The south, west and north boundary of Lot A is semi-circular in form and though

somewhat irregular it may, for our purposes here, be described as commencing at the southeast corner and extending in the form of a half circle around Lot A, terminating at the northeast corner thereof.

There were no front property lines of either Lots A or B established by recorded plats or private restrictions under provisions (*a*) and (*b*) of the statute. Therefore, establishment of front property lines for the two lots was left to the determination of the governing body under provision (*c*).

The residence of plaintiff and a small guest house were located on Lot B. The residence is approximately in the center of the lot and the guest house is in the northwest portion thereof. There are no improvements on Lot A.

The methods employed in spreading the assessments complained of were described by Myron K. Nelson, chief engineer of defendant sewer district.

Nelson testified as follows:

"A. The determination was made that Lot A was bounded by a street, Perry Lane. That Lot B fronted or abutted or was bounded by 57th Street on the North and Hocker Drive on the South and from this basis the 150-foot rule was applied, but since it overlapped, the actual area was used.

"Q. Then is it true to say that it was the determination on this apportionment, then, that this property as far as Lot B is concerned, fronted and abutted two streets?

"A. Yes, sir.

"Q. And therefore a front property line was determined as it related to both of those streets?

"Yes, sir."

With reference to Lot A he testified:

"Q. In reference to Lot A, what was the determination of the Board of County Commissioners in apportioning the cost of this assessment?

"A. That the Lot A fronted or abutted on Perry Lane and that the depth in an east-west direction did not exceed or did not reach the 150-foot limits, so that the total area was assessable."

Nelson's testimony indicates that Lot B was determined to have two front property lines, merely because it abutted Hocker Drive on the south and 57th Street on the north. The total area of Lot B was assessed because measurements back 150 feet from each of the two front property lines overlapped.

The total area of Lot A was assessed because the depth measured back from the apex of the half-circle front property line on Perry Lane did not reach 150 feet.

Plaintiffs contends that the two lots, both separately described and listed on the tax rolls, were used as one tract for a homestead and should be considered only as one tract for sewer assessment purposes. And further, since the only improvements on the lots were the home and a small guest house, located on Lot B, both of which face south toward Hocker Drive, the front property line of plaintiff's property, under the provisions of the statute (19-2793), was the south line of Lot B abutting Hocker Drive and the south-southwesterly portion of the semi-circular boundary of Lot A abutting Perry Lane. That the assessment against her should be calculated by measuring back 150 feet from the front property line, as described and square feet computed, totaling 24,000 square feet in Lot B and 11,942 square feet in Lot A, as opposed to the total area assessment arrived at by defendants of 45,525 square feet in Lot B and 24,943 square feet as to Lot A.

The trial court reviewed the legislative history of the statute and found that the purpose of the changes made was to cure and alleviate the inequities of a total square foot tax on exceptionally deep or large irregularly shaped tracts. The court then concluded that when the legislature revises an existing law a presumption is raised that a change is intended and should be given effect. The rationale of the trial court in this regard is in line with many decisions of this court. (*State, ex rel., v. Richardson*, 174 Kan. 382, 256 P. 2d 135, and *Curless v. Board of County Commissioners*, 197 Kan. 580, 419 P. 2d 876, and cases cited therein.)

With respect to the meaning of the term "front property line," and the factors to be considered in a determination thereof regarding a tract of land, the trial court ruled:

"No. 10. The word 'front' as used in the term 'front property line' in K. S. A. 19-2793, means that side of the land toward which a house or building thereon situated faces, generally having a driveway and main entrance to and from the house on such side of the property; it is that portion of the lot which is opposite the rear. (103 P. 2d 1052, 1054; 42 N. E. 323, 326; 140 A. 763)

"No. 11. The word 'front' as used in the term 'front property line' in K. S. A. 19-2793, as applied to Lot A, being a vacant lot, is that side of the lot towards which, in ordinary circumstances, a house, when and if built, would most likely face considering the general custom of building houses with their main entrance toward the street and further considering the past usage of the lot.

"No. 12. K. S. A. 19-2793 clearly contemplates for a single parcel of land only one 'front property line' be determined by the Governing Body and from that front property line the statute determines the depth to be assessed to be one hundred fifty (150) feet unless the 'rear property line' is less than one

hundred fifty feet. That no land in excess of a depth of 150 feet was to be assessed is clearly evidenced by the proviso provision under the statute as being in excess of a depth of 150 feet measured from the front property line to be thereafter assessed when additional improvements are placed thereon and served by lateral sewers.' "

The trial court then proceeded to establish a front property line for each lot as follows:

"No. 16. That a 'front property line' for Lot A, Corbin Place Resurvey, should be established by dividing the circumference or perimeter commencing at the Southeasterly corner of said lot, thence Southwesterly to a point one half of the distance of the perimeter.

"No. 17. That Lot A, Corbin Place Resurvey, should be assessed to a depth not to exceed 150 feet as measured at right angles to the 'front property line' herein determined.

"No. 18. That the 'front property line' for Lot B, Corbin Place Resurvey, should be established along the Southerly boundary of said lot adjacent to Hocker Drive.

"No. 19. That Lot B, Corbin Place Resurvey, should be assessed to a depth 150 feet from the 'front property line' as herein determined."

With respect to its holding as to the front property line for Lot B, the trial court apparently pursued two lines of reasoning. First, that under the facts as established by the evidence, it was unreasonable and arbitrary to determine a front property line on both the south (Hocker Drive) and north (57th Street) boundaries of Lot B and, second, that K. S. A. 19-2793 contemplates only one front property line for a single parcel of land.

We believe the first line of reasoning to be sound.

In the *Hessell* case we noted various factors and physical characteristics that may influence the determination of the front property line or lines of a particular tract. There it was stated:

". . . The location, use and frontage of buildings on property are of importance in determining front property lines and the size, shape, location, topography, accessibility and even the view to surrounding property may be significant. (See *Bldg. Inspector v. McInerney*, 47 Wyo. 258, 34 P. 2d 35; *Connecticut Mutual Life Ins. Co. v. Jacobson*, 75 Minn. 429, 78 N. W. 10; *Staley v. Mears*, 13 Ill. App. 2d 451, 142 N. E. 2d 835; *Aller v. Berkeley Hall S. Foundation*, 40 CA 2d 31, 103 P. 2d 1052.)"

And we held:

"In determining the front property line or lines of a tract of land under K. S. A. 19-2793 (L. 1965, Ch. 170, Sec. 2.) the governing body of a lateral sewer district should consider the size, shape, location and topography of the land; the location, use and frontage of buildings thereon; and the location of public right-of-ways accessible to the property." (Syl. ¶ 5.)

In the instant case, as in *Hessell,* the evidence discloses the front property lines were established on two sides of Lot B merely because it abutted on two streets. Other factors relevant to the determination of front property lines were not considered.

This was shown by the testimony of defendants' chief engineer Nelson, which we have recited.

The testimony of Francis Hughes, another of defendants' engineers, is narrated as follows:

". . . that his instructions, where property had a street on one side and a street on the other, was to spread the cost to a depth of One Hundred Fifty feet (150') on both sides, which in this case resulted in the Silks property having a front property line extending clear around on both sides. . . ."

Robert R. Bayles, a consulting engineer, testified for plaintiff. He gave his opinion that the front property line of Lot B was on the south, as claimed by plaintiff. Bayles testified:

" . . . I have this opinion by virtue of the direction in which the improvements are faced, the legally assigned postal address, the means of access and egress on the property as indicative of what constitutes a frontage and this is an opinion, but it is also my opinion that the mere term front property bears with it a need to identify a rear property and that this property indeed has both. . . ."

We believe the evidence entirely supports the trial court's conclusion that a determination of a front property line on two sides of Lot B is unreasonable and arbitrary.

The testimony of their engineers discloses that defendants determined the two front property lines on Lot B merely because it abutted on two streets. On the other hand, plaintiff's evidence, consisting of her testimony, that of engineer Bayles and various exhibits, reveals relevant physical facts and circumstances which should have been considered but were ignored by defendants.

While what has been said disposes of this appeal as to Lot B, we feel called upon to point out the fallacy of the trial court's second line of reasoning expressed in conclusion No. 12. The trial court interpreted K. S. A. 19-2793 to the effect that it contemplates only one front property line for a single parcel of land. Proviso (c) of the statute merely directs that a "front property line" shall be determined by the governing body if it was not established by a recorded plat or a recorded private restriction. The determination, like other actions of an administrative body, must be reasonable and not arbitrary or capricious. If a determination is made in a reasonable manner, based upon the relevant physical facts and circum-

stances, which we have enumerated, there is nothing in the statute which precludes the establishment of more than one front property line for a single tract of land.

Defendants next contend that even though the north 110 feet of Lot B is exempt as being beyond the 150 foot depth, nevertheless it is assessable under the proviso of 19-2793, which authorizes assessment of any land which shall have been exempted as being in excess of a depth of 150 feet measured from the front property line, if such land shall thereafter be served by a lateral sewer. Defendants argue the proviso applies only if previously exempted lands were later to be served by the construction of an additional sewer facility and not if sewer service is available but not used at the time costs were apportioned.

In the instant case a lateral sewer line was constructed on 57th Street on the north boundary of Lot B. The line was tapped which made it available for use by the exempted north portion of Lot B. Even though not used (plaintiff's improvements use a septic tank system and are not connected with either the 57th Street or Hocker Drive sewer line) defendants contend the 57th Street lateral served the north portion of plaintiff's Lot B when constructed and, therefore, the exempted land must be initially assessed. Defendants argue that availability, rather than use, controls. In the absence of statutory provision to the contrary defendants' point is well taken and in line with our decisions.

In discussing the spreading of costs of a lateral sewer under the provisions of G. S. 1945 Supp., 19-2737, as it then existed, this court stated in *Johnson County Comm'rs v. Robb*, (1946) 161 Kan. 683, 171 P. 2d 784:

". . . Benefits from installation of a sewer system arise not only from use, but from availability for use. . . ." (p. 694.)

The statement is entirely correct but it was qualified by the court in noting that it was not aware of any statute providing that assessment of costs depends on amount of use or that an assessment is invalid prior to the time the sewer is actually used.

The statute (19-2793) referred to in the *Robb* case, at the time and now (K. S. A. 1968 Supp. 19-2793), provides that costs be spread equally per square foot over all land in the lateral sewer district.

K. S. A. 19-2793, with which we are dealing, provides an entirely different method of spreading costs from that provided in 19-2737.

To apply the availability of use concept urged by defendants, would negate the provisions for exempted areas which result from assessment to a depth of 150 feet from the front property line provided for in 19-2793. This aspect of 19-2793 was construed in the *Hessell* case to the effect that the term "served" as used in the proviso, with respect to exempted land, connotes service to improvements through a connection with lateral sewers. Our reasons for this construction of the statute are set out in detail in *Hessell* and need not be repeated.

Under the evidence the establishment of a front property line on the north boundary of Lot B, abutting 57th Street, was unreasonable. Therefore, that portion of Lot B beyond the 150 foot depth, measured from the front property line on Hocker Drive, is exempt under the terms of the statute. Since exempted lands do not become subject to assessment and levy under the proviso, until thereafter served through a sewer connection, the exempted portion of Lot B was not subject to assessment at the time costs were apportioned. It must be kept in mind, however, that the proviso only applies to exempted lands.

With respect to Lot A the testimony of Nelson and Hughes was that it abutted on Perry Lane, which was determined to be the front property line. The depth (east and west) of the lot from the apex of the semi-circle formed by Perry Lane to the east boundary, was less than 150 feet and, therefore, the total area was assessable. As noted, there are no improvements on Lot A, nor was there evidence of the possible future location of improvements that would indicate a frontage other than Perry Lane. There was no other evidence, of physical facts or circumstances, adduced from the exhibits or the testimony that would tend to show the determination of Perry Lane as the front property line of Lot A to be unreasonable, arbitrary or capricious. The burden of proof is upon the plaintiff. Since the evidence falls short of proving the action of the governing body to have been arbitrary, capricious or unreasonable, the assessment of Lot A is not illegal and void on this ground.

In holding the assessment of Lot A to be illegal, the trial court apparently relied principally on evidence that Lot 19, Vernon Place Subdivision, a tract similar in shape had been assessed in a different manner by defendants. From this evidence the trial court concluded plaintiff had been denied equal protection and application of the law. The conclusion would be entirely proper if sup-

ported by facts. The testimony of chief engineer Nelson and exhibit 7, a plat showing the location and characteristics of Lot 19, reveals that the two lots in question are similar in shape and street frontage. However, the same evidence discloses that the assessment of the two lots was determined by use of the same method. The difference in assessment resulting from the fact that the depth of Lot 19, from the apex of the semi-circular frontage, was more than 150 feet which resulted in the balance being exempted; while the same measurement applied to plaintiff's Lot A is less than 150 feet resulting in a total square footage assessment under the statute (19-2793). Since the same method was used in assessing the two lots there was no unequal application of the law.

One further point requires our brief attention. Plaintiff argued in her petition and claims in her testimony that Lots A and B should be considered one tract for assessment purposes.

In finding No. 10 the trial court found the two lots have been used as one unit. However, in its conclusions of law the trial court treated the two lots as separate tracts, applied a different rationale, and determined the front property lines of the two lots as separate tracts. There was no cross-appeal and it is doubtful if the question is before us. Be that as it may, here again the burden is on the plaintiff and there is no showing that Lot A is so unsuited for improvements as to support a finding that it was not subject to assessment as a separate tract.

In view of what has been said the judgment is affirmed as to Lot B and reversed as to Lot A.

O'CONNOR, J., not participating.